**42**

 

1

**Expert Testimony of THOMAS R. BARTH**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------X
JAMES A. BRUNO and
KATHLEEN M. BRUNO,

             Plaintiffs,

                         5:09-CV-01308
    -vs-

NIAGARA MOHAWK POWER CORPORATION,
LG CONSTRUCTORS, INC., and
TDT REALTY CORP., CORELLIS HOLDING CORP.,
and THOMAS A. CORELLIS,

             Defendants.
------------------------------------------------X
LG CONSTRUCTORS, INC.,

                 Third-Party Plaintiff,

    -vs-

MICHELS POWER, A DIVISION OF MICHELS
CORPORATION and MICHELS CORPORATION,

                 Third-Party Defendant.
------------------------------------------------X

    EXPERT TESTIMONY of **THOMAS R. BARTH**, held on

November 8, 2011, commencing at 10:05 a.m., at the

offices of Powers & Santola, LLP, 39 North Pearl

Street, Albany, New York 12207, pursuant to Notice;

before Susan Florio, RPR and Notary Public in and

for the State of New York.

103

1   [THOMAS R. BARTH - By Mr. Glasheen]

2        back.)

3        A.    It's a question that I don't understand.

4        Q.    All right.  Okay.

5        A.    That you are asking.

6        Q.    Moving over to Page 4, maintaining a safe

7   approach distance.  I think in the beginning you

8   indicate that a licensed operator of a mobile

9   crane working in the vicinity of power lines must

10  consider all power lines around or near construction

11  demolition and excavation sites as energized until

12  assurance has been given that they are otherwise

13  by qualified representatives of the owner of the

14  power lines.  Do you see that?

15       A.    Yes.

16       Q.    All right.  And would you agree that

17  Parker should have assumed that these power lines

18  were energized?

19       A.    Yes.

20       Q.    All right.  Then it goes on, Parker, the

21  licensed -- while this might be considered to be a

22  violation of 12 NYCRR 23, et al., by Martin

23  Parker, the licensed crane operator, the fact is

105

1  [THOMAS R. BARTH - By Mr. Glasheen]

2      Q.    Were you aware, do you recall Mr. Beatty's

3  testimony that, in fact, the status of the number

4  17 line as energized had been conveyed to Mr. Parker

5  and Mr. Bruno at morning meetings of the drilled

6  foundations folks?

7              MR. SANTOLA:  Object to the form of

8         the question.  I don't believe that was an

9         accurate description of the testimony, but go

10        ahead and answer if you can.

11     A.    I believe that they were notified that

12  the power lines were energized.

13     Q.    All right.  So, that based on what you've

14  concluded, both Mr. Parker and Mr. Bruno knew that

15  the line was energized prior to the occurrence of

16  the accident?

17     A.    Yes.

18     Q.    All right.  And then in that section you

19  go on to note that there will be signs to warn

20  them of the presence of the lines, et cetera.  And

21  there were durable signs on the crane itself,

22  weren't there, as far as you know?

23              MR. SANTOLA:  Object to the form.

116

1    [THOMAS R. BARTH - By Mr. Glasheen]

2        A.    Um-hmm.

3        Q.    Now, pursuant to that regulation, the

4    requirement is if a crane is going to be operated

5    closer than 10 feet there are certain requirements

6    that are to be followed, isn't that the case?

7        A.    Yes.

8        Q.    And one of the requirements is that the

9    utility be notified in writing that they are going

10   to come within 10 feet of the line, isn't that so?

11       A.    That's what I understand, yes.

12       Q.    The utility here is Niagara Mohawk, isn't

13   it?

14       A.    I don't know who, you know.  I can't --

15   who is what there.

16       Q.    If we assume that Niagara Mohawk is the

17   utility, it was entitled to written notification

18   that there was going to be an approach closer than

19   ten feet?  Can you agree with that?

20       A.    Yes.

21       Q.    All right.  Based upon your review of the

22   testimony would you agree with me that Niagara

23   Mohawk did not receive such written notice?

121

1    [THOMAS R. BARTH - By Mr. Glasheen]

2    until safety concerns had been addressed.  Do you

3    see that?

4         A.    Yes.  Yes.

5         Q.    All right.  And he didn't stop the

6    operation of the crane, isn't that true?

7         A.    That's correct.

8         Q.    All right.  And that would be a departure

9    from good operating practices by an operator,

10   isn't that so?

11        A.    That would be correct.

12        Q.    All right.  On the next page you indicate

13   that crane movement should not resume until the

14   operator and signal person agree that the issue at

15   hand has been resolved.

16        A.    Are we on Page 6?

17        Q.    Page 6, yes.

18        A.    What paragraph?

19        Q.    Last paragraph.  Tell you what.  Let me

20   withdraw that.  Let me hold back for just a

21   second.

22             Let me stay on Page 5, if I could.  Okay?

23        A.    Okay.

122

1    [THOMAS R. BARTH - By Mr. Glasheen]

2         Q.    You indicate on maybe the fourth sentence

3    down in that last paragraph, "According to Parker,

4    he began to swing the crane with the suspended

5    load to his right.  He could not see where the tip

6    of the crane's boom was in relation to the

7    overhead lines."

8              And in continuing the operation of the

9    crane when he couldn't make that observation that

10   would be another departure from good operating

11   practices by Mr. Parker, wouldn't it?

12        A.    Yes.

13        Q.    And then below that down near the bottom

14   you indicate that if the operator cannot make the

15   clearance judgment safely, he must stop the

16   operation and require the presence of a dedicated

17   safety observer and/or discuss the dangers with

18   the lift director.  And we can agree that didn't

19   happen, isn't that so?

20        A.    That's correct.

21        Q.    And that was a departure by Mr. Parker --

22        A.    Yes.

23        Q.    -- from good operating practices?

1  [THOMAS R. BARTH - By Mr. Glasheen]

2         Over on the next page under the second --

3  well, I guess it's the first full paragraph on the

4  page.  It says ASME B-30, et cetera.  Also lays

5  out the responsibility of the crane operator which

6  in part requires whenever the operator has doubt

7  as to the safety of crane operations, he will

8  review the requirements with the lift director

9  before operations to understand which conditions

10 could adversely affect the operation of the crane.

11        We can agree that didn't happen, isn't

12 that so?

13     A.    Yes.  We can agree.

14     Q.    And that was a departure by Mr. Parker

15 from good operating practices?

16     A.    Yes.

17     Q.    All right.  And then down at the bottom

18 of that, the next paragraph down, it says that the

19 crane movement will not resume until the operator

20 and signal person agree that the issue at hand has

21 been resolved, and this was not complied with by

22 the crane operator.  We can agree that Mr. Parker

23 didn't do that as well, isn't that so?

124

1  [THOMAS R. BARTH - By Mr. Glasheen]

2      A.    Yes.

3      Q.    And that was a departure from good

4  operating practices?

5      A.    Yes.

6      Q.    Moving on to number 6 on Page 6.  Down

7  near sort of the middle of the paragraph it

8  indicates that the crane operator, Martin Parker,

9  violated these procedures by initiating the

10 operation of a mobile crane in proximity of

11 overhead lines before any daily job briefing or

12 pre-task plan procedures were instituted.  Do you

13 see that?  Sort of in the middle of the paragraph.

14     A.    Yeah.

15     Q.    And that would be a further departure

16 from good operating practices by Mr. Bruno [sic],

17 correct?

18     A.    Yes.

19              MR. SANTOLA:  Object to the form of

20     the question.  Did you mean Bruno or Parker?

21              MR. GLASHEEN:  Thank you, Dan.

22     Mr. Parker I meant it to be.

23              THE WITNESS:  That's what I took it

125

1   [THOMAS R. BARTH - By Mr. Glasheen]

2        as.

3        Q.    Moving over to Page 7 and number 7,

4   second sentence, it says due to the size and

5   forces with which the crane operates, any

6   inadvertent contact can result in significant

7   damage to the property and/or injuries to persons

8   in the vicinity.  Do you see that?

9        A.    Yes.  I do.

10       Q.    Now, this was an 80-ton mobile crane?

11       A.    Yes.  It was.

12       Q.    It's a piece of equipment that's got some

13   size to it, isn't that --

14       A.    Some what?

15       Q.    Some size to it?

16       A.    Yes.

17       Q.    In terms of the movement of the boom of

18   the crane, that can cause damage to objects that

19   it might come in contact with, isn't that so?

20       A.    That's correct.

21       Q.    All right.  And the boom of the crane

22   would be capable of damaging a conductor, an

23   electric conductor, if it hit it, isn't that so?

126

1   [THOMAS R. BARTH - By Mr. Glasheen]

2      A.   That's correct.

3      Q.   And it would be capable of breaking an

4   electric conductor if it hit it with sufficient

5   force?

6      A.   Yes.

7      Q.   All right.  And so the ten foot clearance

8   rule, that applies no matter what, even if the

9   line is de-energized, isn't that so?

10     A.   I'm having a difficult problem with that

11  question because everybody uses this ten foot, ten

12  foot, ten foot.  In this situation there's many

13  different restrictions that say 15, 20, so.

14     Q.   Okay.  Let me rephrase the question.

15          So, the minimum approach distance,

16  whatever it may be under the different standards,

17  that applies even if the line is de-energized,

18  isn't that so?

19     A.   Your question isn't complete.  There's

20  many things that have to happen before that can

21  take into place.

22     Q.   Well, let me move down a little further

23  and I think maybe the fourth sentence down you

127

[THOMAS R. BARTH - By Mr. Glasheen]

indicate that whether or not the overhead line was

energized, the operator must still maintain a

minimum of ten foot clearance in order to avoid

inadvertent contact and resulting damage to the

overhead line.  Do you see that sentence?

    A.    I don't see it.  Where are you at?

    Q.    Right here.

    A.    Right here.  Okay.  Yes.

    Q.    Okay.  And you agree with that?

    A.    Yes.

    Q.    All right.  So, whether or not the line

was energized or not, Parker in coming closer than

ten feet violated that rule, isn't that so?

    A.    Yes.  He did.

    Q.    And that would be another departure by

Mr. Parker from good operating practices?

    A.    Yes.

    Q.    All right.  Down further in that

paragraph there's a sentence, if a crane operator

seeks assistance in determining proper clearances

from another individual, that individual must be

properly positioned relative to the crane boom and

128

1   [THOMAS R. BARTH - By Mr. Glasheen]

2   the overhead line in order to accurately assess

3   the clearances.  Do you see that sentence?

4        A.    Yes.  I do.

5        Q.    All right.  Having reviewed the

6   photographs in this case can you tell us where you

7   would say the spotter should have been located?

8        A.    Can I see a picture?

9        Q.    Sure.  I'll give you a couple of

10  pictures.  I'm not sure which would do you best.

11  Look at those.

12       A.    Okay.  Now, these are the lines that are

13  energized, right?

14       Q.    Yes.

15       A.    Okay.  This setup is wrong.  The crane is

16  in the improper place to go in there.  He has to

17  be 15 feet from the line.  The spotter would be

18  over here to notify him he's within 15 feet of

19  that line or 20 feet away from the line.  They

20  should have the guy standing there.  He could put

21  flags out, anything, to know where the 10, 15 or

22  20 feet is to away from the line before he gets

23  into it.  But he's into the lines.

1    [THOMAS R. BARTH - By Mr. Glasheen]

2         Q.    So, if there were a dedicated spotter

3    where he should be located would be -- if I'm

4    understanding correctly, in front of the crane

5    obviously so the crane operator can see him?

6         A.    Yes.

7         Q.    And 15 to 20 feet I'm going to say to the

8    west or towards the new line; is that correct?

9         A.    Yes.  Yes.

10        Q.    All right.  How far away from the crane

11   should he be located?

12        A.    Where he can make a good visual judgment.

13   It doesn't say feet away from the crane or

14   anything like that.  He should be at the other end

15   of the boom, would be a good place to be.  That

16   way he can see the wires, the load block, low load

17   block, good vision to the crane operator.

18        Q.    And in this case Mr. Bruno was actually

19   underneath the conductors, wasn't he?

20        A.    He was under the lines, yes.

21        Q.    So, in your opinion that wouldn't be a

22   good place for the spotter or observer to be

23   located, is that true?



130

1    [THOMAS R. BARTH - By Mr. Glasheen]

2        A.    That's correct.

3        Q.    All right.  You mentioned that where the

4    position in Section 9, if I'm understanding it

5    correctly, you are indicating that where Bruno was

6    located from his position looking directly up, the

7    separation between the end of the boom and the

8    overhead line cannot be visually assessed.  Why do

9    you say that?

10       A.    Because he's under the boom, he can't see

11   the distance.  It was already past a safe

12   distance.  Mr. Parker had a better view of the

13   boom and everything else.  So, Bruno didn't have

14   the advantages of Mr. Parker.

15       Q.    Why did Mr. Parker have a better view

16   than Bruno?

17       A.    Because he was higher.  He had a -- he

18   knew the height of his boom tip.  He knew the

19   angle of his boom.  He knew the length of his

20   boom.  It's all there for him.

21       Q.    So, let me just double back though.  From

22   Mr. Bruno's perspective, while he may not have had

23   as good a view of the clearances as Parker, would

131

1    [THOMAS R. BARTH - By Mr. Glasheen]

2    he still be able to observe the clearances?

3        A.    Accurately, no.

4        Q.    Is that because of some perception or

5    perceptual problem?

6        A.    By looking at it.  I don't know what you

7    would call it.  He wouldn't be able to see it

8    accurately and determine it.

9        Q.    But Mr. Parker should have been able to

10   do so?

11       A.    Absolutely.  He had all the information

12   there in the crane or the cab.

13       Q.    And because he had that information

14   available and was in a better position to see, is

15   that why you say for Parker to claim he relied on

16   Bruno for input on the clearance between the end

17   of the boom and overhead lines is a serious

18   departure from good and accepted practices?

19       A.    Yes.

20       Q.    When you say a serious departure, is

21   another way of saying that, is it a gross

22   departure?

23       A.    I don't know the terms, but it's a

143

1    [THOMAS R. BARTH - By Mr. Glasheen]

2    Item I, that signals to the equipment operator

3    shall be given by one person designated for the

4    task?

5         A.    Yes.

6         Q.    In terms of this safety manual, is it

7    fair to say that that indicates that Mr. Bruno had

8    some appreciation of the dangers associated with

9    operating equipment near energized overhead lines?

10        A.    Yes.

11        Q.    All right.  Thank you.  You mentioned

12   that you did review the testimony of Martin

13   Parker?

14        A.    Yes.

15        Q.    All right.  And do you recall the

16   testimony where he indicated that their foreman

17   was Mr. Beatty?

18        A.    Yes.

19        Q.    Do you recall the testimony from

20   Mr. Parker that Mr. Beatty gave -- when he gave

21   directions for the work, he gave it to Mr. Bruno,

22   do you recall that testimony?

23        A.    I believe so.

147

1    [THOMAS R. BARTH - By Mr. Glasheen]

2    Mr. Bruno had just as much ability to say, no, we

3    are not going to put it there, didn't he?

4        A.    Again, Mr. Parker has the final say.

5        Q.    Mr. Parker, does he have the final say if

6    he's recommending a course of action that is

7    highly dangerous?

8        A.    Repeat that question again.

9        Q.    Does Mr. Parker have the final say if

10   he's recommending a course of action that is

11   highly dangerous?

12       A.    Mr. Parker has the final say on whether

13   that crane is going to operate, where it's going

14   to be operated, how it's going to be done.

15       Q.    So, Mr. Bruno has no say whatsoever in

16   this determination, is that so?

17       A.    Mr. Bruno is a truck driver.

18       Q.    Would you agree with me that the best way

19   to avoid a contact with an energized electric line

20   is to stay away from it?

21       A.    Yes.

22       Q.    All right.  And would you agree with me

23   that if there are other places to unload those

148

1   [THOMAS R. BARTH - By Mr. Glasheen]

2   caissons that do not require the crane to go under

3   the number 17 line that's a better practice to

4   follow?

5       A.   Yes.

6       Q.   All right.  I'd like to show you Exhibit

7   35, which was marked at a deposition dated

8   12/1/10, and I'm going to direct your attention to

9   the upper photograph and I am going to represent

10  to you that that is a photograph taken by the OSHA

11  inspector on the day of the accident and it depicts

12  a portion of the Corellis laydown area, which was

13  located to the east of the right of way.

14          So, having that information do you see

15  caissons in that photograph?

16      A.   Yes.  I do.

17      Q.   All right.  And do you see that those

18  caissons are located at a location where there are

19  no energized conductors close by?

20      A.   Yes.  I do.

21      Q.   All right.  And can we agree that that,

22  in terms of safety, that that would have been a

23  better location to unload those caissons and avoid

154

1   [THOMAS R. BARTH - By Mr. Glasheen]

2        Q.    I'll going to represent to you that the

3   person who wrote this information is Martin

4   Parker.

5        A.    Okay.

6        Q.    That's what the testimony has indicated.

7   Do you see where one of the hazards noted is

8   electric shock?

9        A.    Um-hmm.

10       Q.    All right.  And do you see the language

11  properly rig and secure all loads?

12       A.    Um-hmm.

13       Q.    All right.  Do you see adhere to safety

14  and rigging cautions?

15       A.    Yes.

16       Q.    Do you see tailboard, plan your work and

17  work your plan?

18       A.    Um-hmm.

19       Q.    Do you see where Parker said if unsure of

20  task, stop, ask, and understand before proceeding?

21       A.    Yes.

22       Q.    If task or plan changes, everyone on the

23  crew must know?

1    [THOMAS R. BARTH - By Mr. Glasheen]

2        A.    Yes.

3        Q.    All right.  I'm going to represent to you

4    that's Mr. Parker's signature.  Do you see that?

5        A.    Yes.

6        Q.    And do you see Mr. Bruno's signature

7    there?

8        A.    Yes.

9        Q.    And I'd like to show you Exhibit E from a

10   deposition dated 6/3/11.  And, again, I'm going to

11   represent to you that this is in Mr. Parker's

12   handwriting.  Do you see electric shock being

13   noted there?

14       A.    Yes.

15       Q.    Do you see this language energized line

16   20 feet -- can you make that out?

17       A.    From.

18       Q.    From load?

19       A.    Okay.

20       Q.    Does that look like load?

21       A.    It could be.  Yes.

22       Q.    All right.  And do you see them saying

23   345 kV grounded line safety -- withdraw that.

156

1   [THOMAS R. BARTH - By Mr. Glasheen]

2          Do you see qualified signal person?

3   A.    Yes.

4   Q.    And do you see tag load?

5   A.    Yes.

6   Q.    Does that mean use a tag line?

7   A.    That would be my --

8   Q.    Your best guess?

9   A.    Yes.

10  Q.    All right.  And do you see again

11  tailboard, plan your work and work your plan?

12  A.    Yes.

13  Q.    Do you see if unsure, stop and ask until

14  you understand?

15  A.    Yes.

16  Q.    Keep unnecessary personnel out of the

17  area?

18  A.    Yes.

19  Q.    Use a signal man?

20  A.    Yes.

21  Q.    Use tag line on load?

22  A.    Yes.

23  Q.    Do you see all those things?

157

[THOMAS R. BARTH - By Mr. Glasheen]

1

2      A.      Yes.

3      Q.      And do you see Mr. Parker's signature?

4      A.      Right.

5      Q.      And do you see Mr. Bruno's signature?

6      A.      Is that his?  I don't know.

7      Q.      I'm going to represent to you that it is.

8      A.      Okay.

9               MR. GLASHEEN:  And, Dan, you can

10     disagree.

11              MR. SANTOLA:  (Nodding in the

12     negative.)

13              MR. CERUSSI:  What's the date of

14     that PTP?

15              MR. GLASHEEN:  5/30/09.

16              MR. SANTOLA:  Wait a minute.

17     5/30/09 is the date of it?

18              MR. GLASHEEN:  Yes.

19              MR. SANTOLA:  Okay.  I was thinking

20     the date of the exhibit.

21              MR. GLASHEEN:  6/3.

22     Q.      Based on those PTPs would you agree with

23     me that both Parker and Bruno were aware of the

158

1    [THOMAS R. BARTH - By Mr. Glasheen]

2    hazards posed by overhead lines and aware of the

3    mitigation measures to be taken with respect to

4    those lines?

5         A.    According to those, yes.

6         Q.    All right.  By the way, do you remember

7    in the testimony that there was a radio in Bruno's

8    truck that they could have called the foreman to

9    clear up any kind of misunderstandings?

10        A.    Yes.  I remember that.

11        Q.    So, if in the course of this unloading

12   operation if there was any question regarding the

13   energization of the lines or whether it was a good

14   idea to do that or whether they need an additional

15   person, they had the means to request the

16   assistance, didn't they?

17        A.    They had a radio, yes.

18        Q.    Do you recall the testimony that Mr.

19   Beatty had advised them that if it was raining,

20   just to stop and get inside the truck?

21        A.    Say that again.  I didn't hear you.

22   There was somebody coughing.

23        Q.    Well, let me withdraw that.

1    **[THOMAS R. BARTH - By Mr. Glasheen]**

2    A.    Yes.

3    Q.    And would you agree that there are

4    certain safe practices that are generally followed

5    with respect to people who are rigging loads and

6    working around the loads?

7    A.    Yes.  I would agree with that.

8    Q.    All right.  And is sort of one of the

9    fundamental rules that you stay away from the load

10    as much as possible?

11    A.    At certain times, yes.

12    Q.    And would you agree that it's not a good

13    practice to be standing in close proximity to the

14    load?

15                MR. SANTOLA:  Object to the form.

16    A.    It depends on the situation.

17    Q.    All right.  In this situation Mr. Bruno,

18    at least based on Mr. Parker's testimony, was

19    standing in front of the second caisson roughly

20    four feet in from the end, I think was the

21    testimony, and either touching it or pretty close

22    to it was Mr. Parker's testimony.  Would you agree

23    that that really wasn't a good position for

166

[THOMAS R. BARTH - By Mr. Glasheen]

Mr. Bruno to be in?

A.     It depends on what they were doing at the time.

Q.     All right.  Typically when working around a heavy load like that, is it a good practice to use a tag line?

A.     Yes.

Q.     And is the purpose of the tag line to enable the rigger to control the load without getting either under it or in close proximity to it?

A.     That would be correct.

Q.     And is it a good practice also in terms of working around electric lines to use an insulated tag line?

A.     That is correct.  Which they were not provided that.

Q.     All right.  Were you aware that they did have tag lines in the truck?

A.     Yes.

Q.     All right.  Were you aware that no tag line was used?

232

STATE OF NEW YORK

COUNTY OF _____

     I have read the foregoing record of my

testimony taken at the time and place noted in the

heading hereof, and I do hereby acknowledge it to

be a true and correct transcript of same.




_Thomas R Barth_
_____

    THOMAS R. BARTH




Sworn to before me this

_12_ day of _December_, 20_11_.

_Virginia L. Davidson_
_____

NOTARY PUBLIC

Virginia L. Davidson
Notary Public for South Carolina
My Commission Expires July 29, 2019

233

C E R T I F I C A T I O N

I, Susan Florio, Registered Professional
Reporter and Notary Public, do hereby certify that
I recorded stenographically the proceedings herein
at the time and place noted in the heading hereof,
and that the foregoing transcript is true and
accurate to the best of my knowledge, skill and
ability.

IN WITNESS WHEREOF, I have hereunto set
my hand this 19th day of November, 2011.

SUSAN FLORIO, RPR

## CORRECTION SHEET

Upon reading the deposition transcript and before subscribing thereto, the deponent indicated that the following changes should be made:

**PAGE #**    **LINE #**

26    3    Should read as follows: Picks, How to Rig up Loads,
_Three on the Cable, Double Basket,_
Reason for Change: _Vertical_

110    17    Should read as follows: By ASme B-30

Reason for Change: _____

114    3    Should read as follows: Asme B-30

Reason for Change: _____

_____    _____    Should read as follows: _____

Reason for Change: _____

_____    _____    Should read as follows: _____

Reason for Change: _____

_____    _____    Should read as follows: _____

Reason for Change: _____

_____    _____    Should read as follows: _____

Reason for Change: _____

_____    _____    Should read as follows: _____

Reason for Change: _____

_____
Thomas R. Barth

Sworn to before me this
_12_ day of December, 2011.

_____
Notary Public

Virginia L. Davidson
Notary Public for South Carolina
My Commission Expires July 29, 2019